56 CCPA

**Antonio ROIG, Sucrs. S. En C., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Customs Appeal No. 5307.**

United States Court of Customs
and Patent Appeals.

April 3, 1969.

Worley, C. J., and Baldwin, J., dissented.

Salvador E. Casellas, Fiddler, Gonzalez & Rodriguez, San Juan, P. R., for appellant.

Edwin L. Weisl, Jr., Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Morris Braverman, Owen J. Rader, New York City, for the United States.

Before WORLEY, Chief Judge, McGUIRE, Judge, sitting by designation, and RICH, SMITH, ALMOND, and BALDWIN, Judges.

RICH, Judge.

The instant importation was invoiced as a "Henderson 10 ton fixed electric tower crane with one spreader bar," and classified as an article having as an essential feature an electrical element or device under par. 353 of the Tariff Act of 1930, as modified by the Torquay Protocol to GATT, T.D. 52739, which reads:

> Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:
>
> \* \* \* \* \* \*
>
> Other (\* \* \*) ...... 13¾% ad val.

The importer contends the crane is entitled to free entry under par. 1604, Tariff Act of 1930, which reads:

> Agricultural implements: Plows, tooth or disk harrows, headers, harvesters, reapers, agricultural drills and planters, mowers, horserakes, cultivators, thrashing machines, cotton gins, *machinery for use in the manufacture of sugar*, wagons and carts, cream separators valued at not more than $50 each, and all other agricultural im-

plements of any kind or description, not specially provided for, whether in whole or in parts, including repair parts: *Provided*, That no article specified by name in Title I shall be free of duty under this paragraph. [Our emphasis.]

Appellant's proofs consisted of the testimony of one witness and 5 exhibits consisting of a catalog of the crane manufacturer, two photographs of the crane in operation, a plan of its pile-supported foundation, and the "Gilmore Louisiana-Florida Sugar Manual," published 1963. The witness, Supervising Engineer with the Roig enterprises for 29 years, described the crane, which he was instrumental in ordering, as follows:

> It consists of a central tower. It is about 60 feet high, maybe 10 feet square, and on top of the tower horizontal[ly] is mounted a boom, which is 100 feet long toward the front part of the crane, and maybe 20 feet toward the back side of the crane, which is counterbalanced to offset the weight which might go on the other end.

> \* \* \* \* \* \*

> The crane weighs complete, as assembled now, 65 tons. The foundation extends 65 feet under ground. It consists of 16 concrete piles driven 65 feet into the ground at an angle.

As to the crane's function, the witness testified that:

> In a sugar mill they work 24 hours a day. Unfortunately in very few cases you can bring cane from the field at night, and therefore during the day you have to store sugar cane to work at night. The only way you can do that is by stockpiling, and we do that by dumping the sugar cane on the ground, and placing it with the crane—the crane is provided with a set of grabs, and in our case, places the cane under the crane. During the night we take from the stockpile and place it on the conveyor so we can grind it.

The importer relies here, as below, on two alternative aspects of par. 1604, viz., "Agricultural implements," and "machinery for use in the manufacture of sugar," emphasis being placed on the latter.

In dealing with the first proposition the Customs Court stated, correctly we think:

> The uncontradicted evidence herein establishes that sugarcane is produced in two states on the mainland of the United States, Florida and Louisiana, and in the State of Hawaii as well as in the commonwealth of Puerto Rico. The record establishes to our satisfaction that the chief use of cranes of the class or kind in question is generally by sugarcane mills.

While the court may take judicial notice of the fact that the production of sugarcane is an agricultural pursuit, it is not clear that the imported crane falls within the purview of the provision for agricultural implements. The term "agricultural implements" was defined in the case of United States v. Boker & Co., 6 Ct.Cust.Appls. 243, T.D. 35472, which involved a predecessor provision contained in the Tariff Act of 1913. The court therein, after reviewing a number of dictionary definitions, concluded that the term "agricultural implements" embraced articles "such as pertain to human and incidental animal subsistence—the substantial requirements of life (food) and possibly man's comfort (raiment)." This definition was further amplified in United States v. Tower, 6 Ct.Cust.Appls. 562, T.D. 36199, wherein the court held that an agricultural implement serves some purpose in the production of food from the soil or in the raising of domestic animals. The imported crane does not fall within either definition as set forth, *supra*, inasmuch as the function of the imported merchandise is to handle the sugarcane after it is grown, cut, and transported to the sugar factory. The use is not by the farmer or

on the farm but by the sugar processor at the sugar factory.

While cranes used on farms for the loading of sugarcane into carts and sugarcane slings used for the loading of cane on a farm have been held to be agricultural implements, the involved cranes do not fall within the same category since they are not used by the farmer on the farm for agricultural purposes. See In the Matter of Jose Romaguera, 39 Treas. Dec. 25, T.D. 38592; United States v. Compania Azucarera Del Camuy, Inc., *supra*.

With respect to the contention that the crane is machinery for use in the manufacture of sugar, we have examined the various decisions of the Customs Court and this court cited by respective counsel but find none to be precisely in point or controlling here. The Customs Court and both parties to this appeal rely primarily on the latest expression of this court on the application of "machinery used in the manufacture of sugar," in paragraph 1604, in James A/C The Consolidated Packaging Corp. v. United States, 48 CCPA 75, C.A.D. 768. There the importation denied free entry under that paragraph was a machine for weighing and packaging, in two-pound bags, sugar which had already been completely manufactured. We there said:

The Customs Court found no dispute that the involved machine was designed for and is specifically used for the packaging of sugar. The court then held that packaging does not constitute manufacture and that "the type of machinery contemplated by Congress to be within the purview of paragraph 1604, *supra*, was to include only those machines used in the manufacture of sugar *per se*." In support of this holding, the court quoted as follows:

Summary of Tariff Information, 1929, on Tariff Act of 1922, Volume 2, Schedule 15, Free List, page 2174:

DESCRIPTION AND USES.— Sugar-mill machinery includes rolls for crushing cane and extracting the juice, filter presses, tanks, coils, and evaporators, and centrifugal machines for separating the molasses from sugar. In beet-sugar manufacture the crushers used in cane-sugar production are replaced by washers, slicers, and tanks for extracting the sugar with hot water.

\* \* \* \* \* \*

Here the congressional intent in the use of the words "machinery for use in the manufacture of sugar" must be resolved. The only word in this phrase which seems to cause some difficulty is the word "manufacture." "Manufacture," according to Funk & Wagnalls New Standard Dictionary (1938), is defined as follows:

manufacture, *n.* 1. The operation of making articles for use by working on or combining material; the production of goods, etc., by industrial processes or art; as, the *manufacture* of lace.

\* \* \* \* \* \*

2. Anything made by industrial art or processes; manufactured articles collectively; also, figuratively, the product or result of any process; \* \* \*

Applying this meaning to the word "manufacture" as used in paragraph 1604, there can be no doubt that it does not encompass appellants' sugar weighing and packaging machine. This machine does not *make* sugar or treat the sugar itself in any manner. Its only function is to weigh and package the manufactured sugar.

\* \* \* \* \* \*

Whether a so-called liberal interpretation of the Act is ever warranted to carry out the intent of Congress is not pertinent to the issue in this case since such an interpretation at least should involve a device that has some relation to the manufacture of sugar per se. This was found to be so both in the *Savannah Sugar* and *American Express Co.* cases. We do not find that to be the situation here.

In United States v. American Express Co., 6 Ct.Cust.Appls. 494, T.D. 36124,

this court passed on the classification of devices known as "fraises" which were used to sharpen the knives of beet-cutting machines in beet-sugar factories. It appeared that such knives had to be frequently sharpened to keep the cutting machines operative. The Government said the goods were files and argued that they never came in direct contact with the beets "and have no direct intervention in the making of sugar * * *." The court held:

> Beet-knife sharpeners, as disclosed by the record, are just as indispensable to a beet-sugar factory as are beet-cutting machines. They constitute a necessary part of the factory equipment and are not only chiefly used, but apparently exclusively used, by such factories. They are, therefore, we think, entitled to free entry.

Savannah Sugar Refining Corp. v. United States, 29 Cust.Ct. 88, C.D. 1450, was discussed and distinguished in *James* on the ground that the servo-weigher used in *Savannah* was important in the process of refining the sugar, whereas the weighing and packaging machine in *James* was used only *after* the sugar had been completely manufactured.

The evidence in this case shows that the Henderson tower crane is manufactured expressly for use in cane-sugar mills and that its chief use is in such sugar mills. It shows further, as the single witness testified without contradiction, that 75% of the sugar mills in Puerto Rico have similar cranes. The Sugar Manual in evidence shows that out of 49 mills in Florida and Louisiana, all but three used this type of crane. The crane is of a type, moreover, which is permanently installed at the sugar mill and is therefore fixed in its use in handling and stockpiling sugar cane and for no other significant use.

We deem this function to be the first step in the process of manufacturing sugar from the cane. The agricultural process and the transportation to the sugar mill have been completed. When the crane picks up the cane from the stockpile and starts it on its way into the factory, it seems only reasonable to us to hold that "manufacture" has begun.

We agree with the importer that the language "used in the manufacture of sugar" was intended to benefit the sugar manufacturing industry. It should be given a liberal construction to that end, which was clearly the purpose which Congress had in mind when it included such machinery in paragraph 1604. Surely, the crane in its function and permanent installation as a part of the sugar mill is as closely related to the manufacturing process—the making of sugar from sugar cane, which requires a multitude of operations and many pieces of equipment of various kinds—as were the "fraises" or knife-sharpeners in the *American Express* case.

The judgment is reversed.

Reversed.

SMITH, J., participated in the hearing of this case but died before a decision was reached.

WORLEY, Chief Judge, dissenting, with whom BALDWIN, Judge, joins.

I agree with the importer that the language "used in the manufacture of sugar," appearing in paragraph 1604 of the 1930 Tariff Act, was intended to benefit that particular industry, and in a very broad sense could possibly embrace every type and kind of machinery directly, or indirectly, used in a sugar mill plant. However, had Congress intended such sweeping concessions it could have easily said so, but it did not, choosing rather to restrict free entry to that machinery used only in the *manufacture* of sugar.

I do not see where the instant crane, although obviously contributing to the ultimate production of sugar, is *actually* involved in the manufacture of sugar *per se.* The scales denied free entry in *James* were used *after* the manufacturing process was completed; the crane here, in my view, is used before the *pro-*

*cess* begins. I think the Customs Court properly followed the reasoning in the *James* decision, quoted by the majority, in dismissing the importer's protest. I would affirm its judgment.